Peter Strojnik, 6464
THE LAW FIRM OF PETER STROJNIK
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-297-3019
Facsimile: 602-297-3176
E-mail: Strojnik@aol.com
Attorney for Defendants

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In Re: RICHARD AND SONDRA CAMPBELL,<br><br>Debtors.<br>_____<br>JILL H. FORD, Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>PETER STROJNIK and TANYA STROJNIK, husband and wife, TCMS Investments, Inc., an Arizona Corporation.<br><br>Defendants. | (Chapter 7 case)<br><br>No. 2-07-bk-04683-RTB<br><br>Adversary No. 2:08-ap-00861-RTB<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT** |

**SUMMARY OF RESPONSE AND CROSS-MOTION**

Trustee's entire argument is based on a mistaken proposition that "Debtors transferred the sum of $100,000 [sic] to Arizona Precious Metals, Inc. and obtained a release of their obligation to pay $51,380.00 owed to Defendant [Strojnik]". See Motion at 1-2. There are three errors in this statement: First, Debtor transferred $98,796.00 and not $100,000.00. (DSOF 25) Second, the transfer was to USDA Forest Service, not to Arizona Precious Metals

("APM") or Strojnik (DSOF 27). Third, $98,796.00 was paid for the benefit of the Silver King Mine, not Strojnik. (DSOF 21, 25, 27) Strojnik never had any direct, indirect, contingent, current, valid, liquidated, legal, community, joint or any other conceivable interest in the Silver King Mine.

Trustee's Motion deals interchangeably with the November 27, 2006 payment of $98,796.00 to the Forest Service and December 12, 2006, transfer of Debtor's interest in The Funding Group to TCMS. Trustee's argument seems to be that *because* Debtor paid $98,796.00 toward the bond and received a 71.5% interest in the Funding Group, and the Funding Group in turn received a 30% interest in the Joint Venture, that Debtor's Joint Venture interest must be worth $98,796.00. The Trustees refuses to recognize the simple fact that Debtor's $98,796.00 payment to the Forest Service was induced by mining fraud; in exchange for $98,796.00, Debtor received a 71.5% interest in a completely worthless Funding Group whose only "asset" was a 30% interest in a completely worthless joint venture. Thus, the value of Debtor's interest in The Funding Group was not $98,786.00. The value of Debtor's 71.5% interest in the Funding Group was $0.00. (DSOF 38)

Trustee posits that Strojnik was Debtor's insider. Trustee comes to this conclusion based on a wrong timeline, as more fully explained below. Lastly, Trustee's own Exhibits show that the subject transaction was a contemporaneous exchange for new value and that the subject transfer was made in the ordinary course of Debtor's and Strojnik's business (fees for equity) in relation to past practices between them.

Lastly, the Trustee ignores the most important element of them all: All equity interest in APM and in The Funding Group were completely worthless, and Defendants would have

received the same amount in regular distribution as they in fact received – nothing. As more fully discussed below, both APM and the Funding Group filed separate legal actions arising out of this mining quagmire only to be awarded $1.00 in one and to lose the other. Hence the value: $0.00.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. FACTUAL BACKGROUND

Peter Strojnik ("Strojnik") is a Phoenix lawyer. Tanya C. Strojnik is Strojnik's wife. TCMS Investments, Inc. is an investment company wholly owned by Tanya C. Strojnik Separate Property Trust. Strojnik has no equitable, community, joint or other interest in either the Tanya C. Strojnik Separate Property Trust or TCMS Investments, Inc. (DSOF 1)

Strojnik became Debtor's attorney on or about May 30, 2006. Strojnik represented Debtor in two matters: A complex securities matter before the Arizona Corporation Commission styled styled *ACC v. Campbell et al et ux*, NO. S-20484A-06-0669 ("ACC Litigation"); and A Maricopa County Superior Court case styled *Campbell v. AGRA*, Maricopa County Superior Court No. CV 2006-009755 ("AGRA Litigation"). The ACC Litigation was paid hourly; the AGRA Litigation was based on a contingency fee. (DSOF 2-4)

The relationship between Debtor and Strojnik with respect to both litigation matters was conducted at arms length; it never transcended the normal attorney-client boundaries. Thus, for example, during the period in question (May through December 2006) Debtor and Strojnik always met in his office or for a business breakfast to discuss the litigation matters, they did not interact socially, Strojnik sent his invoices to Debtor monthly in the regular course of business, the parties discussed work and fee matters as they would in any other attorney client

relationship, they did not meet socially, nor did they take any other action that would or could be perceived as falling outside the normal attorney-client boundaries. (DSOF 5)

On August 14, 2006, Debtor and Dr. Hans Hüning ("Hüning") incorporated Arizona Precious Metals, Inc. ("APM") On or about August 20, 2006, Debtor and Hüning invited Strojnik to join APM as a director, and Strojnik accepted the invitation. (DSOF 7)

On August 22, 2006, APM and the Silver King Mining Company of Arizona ("SKM") entered a joint venture agreement ("Joint Venture Agreement") for the purpose of reopening the Silver King Mine near Superior, Arizona. The Silver King Mine was opened in the 1870s, but has not operated profitably since 1922. (DSOF 8)

Under the Joint Venture Agreement, SKM would contribute its mining rights in the Silver King Mine, and APM would provide up to $10 million, but no less than $2 million, in financing to commence production of the Silver King Mine. APM was a 60% interest holder in the Joint Venture, and SKM was a 40% interest holder. APM's promise to provide start-up capital for the Silver King Mine Project was based on a pending loan agreement ("Loan Agreement") with Accept Erste Rohstoff Beteiligungs KG ("Accept"), which was executed on September 5, 2006. Under the Loan Agreement, Accept would loan APM $2 million for various mining projects, including $500,000.00 for the Silver King Mine Project. The Loan Agreement enabled APM to reallocate loan proceeds to different projects in the exercise of good faith business judgment. (DSOF 9)

While negotiating the Joint Venture Agreement, Debtor improvidently trusted one Jack San Felice, SKM's CEO ("San Felice") to execute and file a Quit Claim Deed to the Mine with the Pinal County Recorder. San Felice never transferred the Mine into the Joint Venture. As it

turned out, SKM was not even the true owner of the Silver King Mine – the true owners of the Silver King Mine were three brothers, one of whom was dead. (DSOF 10, 11, 12) APM was unaware that Silver King Mining Company was perpetrating a mining fraud upon them. (DSOF 12)

Unrelated to SKM's fraud, Accept breached the Loan Agreement. As a result, APM was unable to fund the Joint Venture and, thus, as of September 8, 2006, APM was in breach of the Joint Venture Agreement. (DSOF 13-14)

On or about October 23, 2006, Debtor advised Strojnik that he could no longer afford to pay legal fees in cash. Debtor offered the only asset he had available for trade – the APM Stock – in exchange for a $10,000 credit toward fees. (DSOF 15) At the time of Debtor's offer to exchange APM stock for fees, APM was no more than a shell corporation. APM had a claim against APM for breach of the Loan Agreement, but was itself in breach of the APM-SKM Joint Venture Agreement. APM was worthless, and its equities were worthless. (DSOF 16)

As of October 23, 2006, APM stock was worthless. According to the Judgment entered by the US District Court in the subsequently filed action against Accept titled *APM v. Accept*, the value of APM's only asset – the claim against Accept for breach of the Loan Agreement - was $1.00. Thus, at the time of the agreement to exchange APM stock for attorney's fees, APM had no value, the APM stock had no value. (DSOF 17, 18).

On October 23, 2006, Debtor resigned as an officer and as a director of APM. (DSOF 19) Following the separation of Debtor from APM, Hüning continued to seek funding for the Joint Venture, without success. (DSOF 20)

On November 17, 2006, the US Forest Service sought to close the Silver King Mine unless Silver King Mine posted a reclamation bond. (DSOF 21) San Felice – the crooked miner - contacted the Debtor to inquire whether Debtor could find an investor or investors to pay for the bond in exchange for an interest in the Silver King Mine. On November 21, 2006, Silver King issued a letter to the Forest Service designating Debtor as a "designated agent" of the Silver King Mine for the purpose of the obtaining and paying the reclamation bond. (DSOF 22)

As of November, 2006, (i) Debtor had no interest in APM; (ii) Debtor was an agent for the Silver King Mine; (iii) The Joint Venture had no assets and was worthless; and (iv) APM had no assets and its stock was worthless. (DSOF 23)

Debtor then approached TCMS and Dr. Hüning to see if *they* could contribute to the reclamation bond. Debtor indicated that he could come up with $100,000.00 if TCMS and Hüning each came up with $20,000.00. (DSOF 24) Indeed, TCMS agreed to invest $20,000.00; Dr. Hüning agreed to invest another $20,000.00, and Debtor agreed to invest the remaining $98,796.00. TCMS, Hüning and Debtor entered into a loosely structured organization under the name The Funding Group, and memorialized their relationship in writing. (DSOF 25) Debtor then paid the bond to the US Forest Service. (DSOF 27) On the same day, the APM-SKM Joint Venture Agreement was modified to reduce APM's interest from 60% to 30%, and accepted The Funding Group as a new 30% joint venturer. (DSOF 28)

At the time of the acceptance of The Funding Group into the Joint Venture, Strojnik still represented Debtor in the ACC and AGRA litigation matters. (DSOF 29) On December 7, 2010, Strojnik and Mike Dailey, ACC Attorney, discussed a possible resolution of the ACC

Litigation. During the discussion, Dailey stated to Strojnik that as part of a settlement, Debtor would have to dismiss with prejudice the AGRA Litigation. (DSOF 30)

If Debtor's case against AGRA were dismissed with prejudice, then Strojnik's contingency fee interest would be terminated and Debtor could become indebted to Strojnik based on Strojnik's regular hourly fee. Debtor and Strojnik both knew that Debtor was financially unable to pay hourly fees for work previously preformed by Strojnik under a contingency fee arrangement. Therefore, Strojnik agreed to "provide the entirety of fees relative to the pending litigation of AGRA Technologies, Inc. free of charge." Debtor and Strojnik further agreed that Strojnik would provide all future services to Debtor in exchange for Debtor's interest in The Funding Group[1]. (DSOF 31)

At the time of the exchange of Debtor's equity interest in the Funding Group for future fees, The Funding Group had only one asset: Its 30% interest in the Joint Venture Agreement. (DSOF 32) But the Joint Venture itself had no value because: (i) The Silver King Mine had never been transferred to the Joint Venture; (ii) The Silver King Mining Company was not the record owner of the Mine; and (iii) Even if the Joint Venture owned the Mine, there was no money to put it into operations. (DSOF 33)

At the time of the exchange of fees for Funding Group interest, Strojnik made the following notation on his invoice:

| CASE | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| Securities | 12-12-06 | Flat Fee Agreement: Stock for fees. Stock value at the time of the agreement: $1,250.00. No more | $0.00 |

---

[1] As it turned out, ACC did not require the dismissal of the AGRA Litigation, and the Contingency Fee Agreement became effective again. (DSOF 31)

|   | billing. |   |
|---|----------|---|

Strojnik's valuation on the invoice was wrong. The value of Funding Interest was not $1,250.00. It was $0.00. (DSOF 34, 35, 36 45)[2] Since the Joint Venture had no value, the Funding Group's 30% interest in the Joint Venture had no value. (DSOF 34) Since the Funding Group's interest in the Joint Venture had no value, Debtor's interest in the Funding Group had no value. (DSOF 35) Thus, the transfer of Debtor's interest in the Funding Group to TCMS resulted in no value to TCMS. (DSOF 36) By agreeing to provide additional legal services free of additional charge, Strojnik incurred an obligation without a return consideration. (DSOF 37) The value of Debtors interest in The Funding Group as of December 12, 2006, was $0.00. (DSOF 38)

The attorney's fees accounting is set forth in Defendants Statement of Facts 39-42.

## II. LEGAL DISCUSSION

In her Statement of Facts, Plaintiff identifies 3 separate transfers:

**First Transfer** occurred on October 23, 2006 when Debtor transferred the entirety of his equity interest in APM to TCMS in exchange for attorney's fees credit of $10,000. (Plaintiff's Statement of Facts 10 and Exhibit B). Trustee does not appear to argue that this transfer is subject to avoidance.

---

[2] The Court may take judicial notice of the litigation in the Pinal County Superior Court styled *The Funding Group v. Silver King Mining Company, Inc.*, CV2007-01884 where the court entered judgment for Defendants and against the Funding Group on its claims against the Silver King Mining Company et al.

**Second Transfer** occurred on November 27, 2006 when Debtor paid $108,796.00[3] to the US Forest Service for a Reclamation Bond. (Plaintiff's Statement of Facts 12.) Trustee references Debtor's 2004 examination for the proposition that this money went to APM. Trustee misstates Debtor's testimony. Debtor did not testify that the money went to APM; Debtor testified, "[t]hen that money went into a bond that was uh, with Arizona.. uh, Silver King, the Silver King Mine of Arizona Inc. - that bond, I lost that bond.") See Plaintiff's Exhibit D at page 2.

Contemporaneously with the **Second Transfer**, the Debtors received a 71.5% interest in a loosely organized group called "Funding Group" which, contemporaneously, received a 30% interest in the Joint Venture. (Plaintiff's Statement of Facts 15) Plaintiff's own Statement of Facts and Exhibits – and the 2004 Examination of Debtor – defy Trustee's notion that the bond money went, directly or indirectly, to any of the Defendants.

**Third Transfer** occurred on December 12, 2006, when Debtor transferred the entirety of his interest in the Funding Group to TCMS "in consideration of attorney's fees, present and future, relative to representation of Client by Strojnik in cases commonly referred to as the ACC case and the AGRA Technologies case". None of the consideration for the Third Transfer involved antecedent debt. (Plaintiff's Statement of Facts 16 and Exhibit E.) Plaintiff's own Statement of Facts and Exhibits show that the Third Transfer was a contemporaneous exchange (fees for equity interest) for new value (future services) given to the Debtor. Plaintiff's own narrative also shows that the Third Transfer was made in the ordinary course of Debtor's and

---

[3] $98,796.00 on his own account, $10,000.00 for Hüning.

Strojnik's business (fees for equity) in relation to past practices (First Transfer was for fees in exchange for equity) between Debtor and Strojnik.

## 11 U.S.C. § 547(b) and (c)

Section 547(b) establishes five elements of a preference action. To avoid a transfer under section 547(b), a trustee must prove that the transfer was made (1) to or for the benefit of a creditor, (2) on account of an antecedent debt, (3) while the debtor is insolvent, (4) within 90 days of filing the bankruptcy petition, or, if the transferee is an insider, within one year of the petition date, and (5) in such a way that it enables the creditor to receive more than if the transfer had not been made. 11 U.S.C. § 547(b)(1)-(5); *USAA Fed. Sav. Bank v. Thacker* (In re Taylor), 390 B.R. 654, 660 (9th Cir. BAP 2008).

§547(c)(1) provides that a trustee may not avoid a transfer to the extent the transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1). "New value" is defined in relevant part as "[m]oney or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2) New value is measured at the time of the transfer.

Additionally, a transfer on account of an antecedent debt is not an avoidable preference to the extent the debt was incurred in the ordinary course of business[4] and the payment (1) was

---

[4] Although the statutory language does not specifically so provide, the 9th Circuit has held previously in cases in which parties have an established course of dealing that § 547(c)(2)(A) and § 547(c)(2)(B) require that "the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor." *Mordy v. Chemcarb, Inc.* (In re Food Catering & Hous., Inc.), 971 F.2d 396, 398 (9th Cir. 1992); see also *Sulmeyer v. Suzuki* (In re Grand Chevrolet, Inc.), 25 F.3d 728, 732 (9th Cir. 1994). In other words, to determine what is "ordinary" among parties who have interacted repeatedly, the 9th Circuit inquires into the pattern of interactions between the actual creditor and the actual debtor in

made in the ordinary course of business or financial affairs of the debtor and the transferee; or (2) the payment was made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

**1. Payment Was Not "To Or For The Benefit Of A Creditor".** The $108,796.00 payment made by Debtor was made to USDA Forest Service for a reclamation bond. At the time Debtor issued the check, he was acting as the agent for the Silver King Mine (DSOF 22), and not as an agent for APM, TCMS, or Strojnik. The payment was to the USDA Forest Service, not APM or Strojnik (DSOF 27). Strojnik had no interest in the Silver King Mine; thus, the transfer was not "to or for the benefit of a creditor". *See In re Incomnet, Inc.,* 463 F.3d 1064 (9th Cir. 2006), aff'd *Incomnet Comm. Corp. v. Universal Serv. Administ. Co.* (*In re Incomnet, Inc.*), 299 B.R. 574, 580-81 (9th Cir. BAP 2003) ("Incomnet").

**2. Payment Was Not On Account Of An Antecedent Debt.** It is improbable that the Trustee is referring to the November 27, 2006 payment to the USDA Forest Service as a payment for an "antecedent" debt – the Debtor owed no money to the Forest Service. The Trustee's argument relating to the "antecedent debt" *probably* relates to the December 12, 2006 transfer of the Funding Group interest to TCMS. Nonetheless, the Trustee equates the November 27, 2006 payment to the USDA Forest Service with the December 12, 2006 transfer of the Funding Group interest to TCMS.

    **a. Trustee's Method Of Arriving At The Sum Of $51,731.00.** Trustee claims that she is entitled to $51,731.00. It appears that the Trustee added the hourly fees incurred up to 12-12-06 in the ACC matter ($7,280.00) and the hourly fee *equivalent* in the AGRA

---

question, not about what transactions would have been "ordinary" for either party with other debtors or creditors. *In re Ahaza Systems, Inc.,* 482 F.3d 1118 (9th Cir. 2007)
-11-
Case 2:08-ap-00861-RTB   Doc 26   Filed 02/24/10   Entered 02/24/10 13:17:25   Desc
Main Document   Page 11 of 16

*contingency fee* representation as of 12-28-06 ($44,451.00). In arriving at its conclusion, the Trustee does not account for the fact that (i) $7,280.00 was wiped off as bad debt (DSOF 31); $44,451.00 was a contingency fee *equivalent* and did not represent actual money owed (DSOF 39-42); or that (iii) the only and true consideration for the 12-12-06 transfer was Strojnik's *future* services in the amount of $32,882.50 provided *after* December 12, 2006. (DSOF 42) See also PSOF 19 and Exhibit F to Plaintiff's Statement of Facts. (DSOF 19, 31, 42)

**3. There Is No Proof That Debtor Was Insolvent**. Trustee argues that the bankruptcy petition filed on September 17, 2007, is proof of Debtor's insolvency on December 12, 2006 – almost a year earlier. The passage of time belies Trustee's argument.

**4. Strojnik was Not An Insider.** Trustee's factual basis for its argument that Strojniks is an insider. On page 8 of the Motion she asserts:

> In this case, at the time of the transfer of funds to APM, Debtor was a shareholder of APM. Thus, APM is an insider of Debtor as defined under 11 U.S.C. §101(31). In addition, Defendant Peter, who was a director of APM, is an insider of APM. Accordingly, Defendant Peter is an affiliate of Debtor and is an insider for purposes of 11 U.S.C. §547.

The above paragraph contains numerous factual errors. First, there was no transfer of any funds to APM – the transfer of funds was to the Forest Service. Second, at the time of the transfer on 12-12-06, Debtor was <u>not</u> a shareholder, officer or director of APM. (DSOF 19) Third, since Debtor was disassociated from APM, APM was <u>not</u> an insider of Debtor. Fourth, Strojnik was an insider of APM but was not an insider of Debtor. Fifth, it is true that Strojnik was a director of APM, and possibly an insider of APM, the question here is whether Strojnik was an insider of the Debtor, not of APM.

Trustee then argues that Strojnik was an insider of Debtor by virtue of the attorney-client relationship between them:

> In this case, Defendant Peter was not only Debtors' attorney, he also was involved with Debtor in a business relationship, as a director of APM, an entity in which Debtor was a shareholder. Defendant Peter invested money, with Debtor, to purchase the reclamation bond. Debtor transferred $100,000 to APM and in exchange, was released of the obligation to pay Defendant Peter's attorneys' fees. Debtor designated Defendant Peter's, wife's entity as the nominee of Debtors' interest in APM and transferred his interest in the Funding Group to the same entity. As a result, Trustee contends that Defendant Peter was an insider for purposes of 11 U.S.C. §547 because the nature of the relationship between Defendant Peter and Debtors extended beyond the boundaries of an attorney-client relationship.

Again, Trustee's "facts" abound with errors: As indicated above, Debtor disassociated himself from APM on October 23, 2006. (DSOF 19) Second, Strojnik never invested any money; the money was invested by TCMS. (DSOF 24-27) Thirds, Debtor did not transfer $100,000 to APM; Debtor transferred the funds to USDA Forest Service (DSOF 24). Fourth, Debtor's interest in APM was transferred on October 23, 2006 – a month earlier than the payment of the bond. (DSOF 15-19).

Based on the erroneous facts, Trustee argues that the relationship between Debtor and Strojnik extended "beyond the boundaries of an attorney-client relationship". But this statement is not supported in the Statement of facts or elsewhere in the record. In fact, the only statement of fact on this issue is offered by Defendants at DSOF 1-5; those statements clearly indicate that the relationship did not extend beyond the boundaries of the attorney-client relationship.

**5. <u>TCMS Received Exactly The Same As He Would Have Under A Chapter 7 Distributions – Nothing.</u>** It is notable that all transfers from Debtor – other than the transfer of

$108,796.00 to the Forest Service - involved transfers of equity interests that had no value. APM equity interest had no value (DSOF 17, 18) Debtor's interest in the Funding Group had no value. (DSOF 34, 35) TCMS received exactly the same value it would have received in the absence of the transfer upon bankruptcy distribution: Nothing.

**6. The 12-12-2006 Transfer Of The Funding Group Interest For Future Fees Was A Contemporaneous Exchange For New Value.** The 12-12-2006 transfer of Debtor's Funding Group Interest – was a contemporaneous exchange for new fees. (DSOF 31, 43)

**7. The 12-12-2006 Transfer Of The Funding Group Interest For Future Fees Was In The Ordinary Course of Business.** Even if a transfer were found to be on account of an antecedent debt (which it was not), it is not an avoidable preference to the extent the debt was incurred in the ordinary course of business and the transfer (1) was made in the ordinary course of business or financial affairs of the debtor and the transferee; or (2) the payment was made according to ordinary business terms. 11 U.S.C. § 547(c)(2). (DSOF 44) Here, the Debtor and Strojnik had established a course of dealing which included exchange of fees for equity interest. Although the statutory language does not specifically so provide, the 9th Circuit has held previously in cases in which parties have an established course of dealing that § 547(c)(2)(A) and § 547(c)(2)(B) require that "the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor." *Mordy v. Chemcarb, Inc.* (In re Food Catering & Hous., Inc.), 971 F.2d 396, 398 (9th Cir. 1992); see also *Sulmeyer v. Suzuki* (In re Grand Chevrolet, Inc.), 25 F.3d 728, 732 (9th Cir. 1994) (quoting In re Food Catering & Hous., Inc). In other words, to determine what is "ordinary" among parties who have interacted repeatedly, the 9th Circuit inquires into the pattern of interactions between the actual creditor

-14-

and the actual debtor in question, not about what transactions would have been "ordinary" for either party with other debtors or creditors. *In re Ahaza Systems, Inc.,* 482 F.3d 1118 (9th Cir. 2007) (DSOF 43) Here, the transfer of the Funding Group interest to TCSM on December 12, 2006 in exchange for fees followed the pattern established by the October 23, 2006 transfer of APM equity to TCMS in exchange for fees.

## 11 U.S.C. 550(A)(1)

Before liability may attach, Trustee must prove that Strojnik was a "transferee" of $108,796.00. As the factual narrative disclosed, Debtor – as the agent of the Silver King Mine – collected $30,000.00[5] from TCMS, added $108,796.00 of his own money, and wrote a check to the USDA Forest Service. Thus, the "initial transferee" was the USDA Forest Service, not Strojnik. See *In Re Incomnet, Inc.*, 463 F.3d 1064 (9th Cir. 2006), aff'd *Incomnet Comm. Corp. v. Universal Serv. Administ. Co.* (*In re Incomnet, Inc.*), 299 B.R. 574, 580-81 (9th Cir. BAP 2003) ("Incomnet"). Ergo, the Trustee appears to argue that the USDA Forest Service was "mere conduit" to Strojnik and that Strojnik had "dominion" over USDA Forest Service[6].

## CONCLUSION AND PRAYER FOR RELIEF

Debtor, APM, TCMS and Hüning got cheated in a classic mining scam by the Silver King Mine. APM, the Funding Group, Debtor, TCMS and Strojnik never had any interest in

---

[5] TCMS paid $20,000 for itself and $10,000 for Hüning.

[6] The 9th Circuit has consistently applied the dominion test and has declined to adopt the control test. *Incomnet*, 463 F.3d at 1064 (affirming Panel holding dominion test did not apply to this one-step transaction case); *Abele v. Modern Fin. Plans Servs., Inc.* (In re Cohen), 300 F.3d 1097, 1102 n.2 (9th Cir. 2002); Incomnet, 299 B.R. at 580-81; *McCarty v. Richard James Enters., Inc.* (In re Presidential Corp.), 180 B.R. 233, 237-38 (9th Cir. BAP 1995).

the Silver King Mine, yet they foolishly traded future attorney's fees as if the mining scam actually had value.  Well, it did not. Defendants request the entry of judgment against Plaintiff plus costs and attorney's fees expanded in this litigation.

RESPECTFULLY submitted this 24th day of February, 2010.

_____
Peter Strojnik
Attorney for Defendants