Peter Strojnik, 6464
THE LAW FIRM OF PETER STROJNIK
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-297-3019
Facsimile: 602-297-3176
E-mail: Strojnik@aol.com
Attorney for Defendants

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In Re: RICHARD AND SONDRA CAMPBELL,<br><br>Debtors.<br>_____<br><br>JILL H. FORD, Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>PETER STROJNIK and TANYA STROJNIK, husband and wife, TCMS Investments, Inc., an Arizona Corporation.<br><br>Defendants. | (Chapter 7 case)<br><br>No. 2-07-bk-04683-RTB<br><br>Adversary No. 2:08-ap-00861-RTB<br><br>**DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT** |

1. Peter Strojnik ("Strojnik") is a Phoenix lawyer. Tanya C. Strojnik is Strojnik's wife. TCMS Investments, Inc. ("TCMS") is an investment company wholly owned by Tanya C. Strojnik Separate Property Trust. Strojnik has no equitable, community, joint or other interest in either the Tanya C. Strojnik Separate Property Trust or TCMS Investments, Inc. (Strojnik Declaration, Exhibit 1)

2. Strojnik became Debtor's attorney on or about May 30, 2006. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2)

3. Strojnik represented Debtor in two matters:

   a. A complex securities matter before the Arizona Corporation Commission styled styled *ACC v. Campbell et al et ux*, NO. S-20484A-06-0669 ("ACC Litigation"); and

   b. A Maricopa County Superior Court case styled *Campbell v. AGRA*, Maricopa County Superior Court No. CV 2006-009755 ("AGRA Litigation"). Id.

4. The ACC Litigation was paid hourly; the AGRA Litigation was based on a contingency fee. Id.

5. The relationship between Debtor and Strojnik with respect to both litigation matters was conducted at arms length; it never transcended the normal attorney-client boundaries. Thus, for example, during the period in question (May through December 2006) Debtor and Strojnik always met in his office or for business breakfast with respect to the litigation matters, they did not interact socially, Strojnik sent his invoices to Debtor in the regular course of business, the parties discussed work and fee matters as they would in any other attorney client relationship, they did not meet socially, nor did they take any other action that would or could be perceived as falling outside the normal attorney-client boundaries. Id.

6. On August 14, 2006, the Debtor and Dr. Hans Hüning incorporated Arizona Precious Metals, Inc. ("APM") The initial officers and directors were Debtor, Hüning and Bob Gunnison. Exhibit 4. Strojnik was not involved in the incorporation. Gunnison has since

resigned his interest in APM. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

7. On or about August 20, 2006, Debtor and Hüning invited Strojnik to join APM as a director; Strojnik accepted the invitation. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration; Exhibit 3)

8. On August 22, 2006, APM and the Silver King Mining Company of Arizona ("SKM") entered a joint venture agreement ("Joint Venture Agreement") (Exhibit 5) for the purpose of reopening the Silver King Mine near Superior, Arizona. The Silver King Mine was opened in the 1870s, but has not operated profitably since 1922. See Opinion in Case 2:07-cv-00707-MHB, *Arizona Precious Metals v. Accept Erste Rohstoff Beteiligungs KG*, Exhibit 6.

9. Under the Joint Venture Agreement, SKM would contribute its mining rights in the Silver King Mine, and APM would provide up to $10 million, but no less than $2 million, in financing to commence production of the "Silver King Mine Project." APM was a 60% interest holder in the joint venture, and SKM was a 40% interest holder. APM's promise to provide start-up capital for the Silver King Mine Project was based on a pending loan agreement ("Loan Agreement") with Accept Erste Rohstoff Beteiligungs KG ("Accept"), which was executed on September 5, 2006. Under the Loan Agreement, Accept would loan APM $2 million for various mining projects, including $500,000.00 for the Silver King Mine Project. The Loan Agreement enabled APM to reallocate loan proceeds to different projects in the exercise of good faith business judgment. Id.

10. Several days prior to August 22, 2006, in anticipation of entering the Joint Venture Agreement, Debtor met with Silver King's CEO Jack San Felice at the Los Hermanos restaurant in Superior, Arizona. At the meeting, Jack San Felice asked Debtor to sign the "grantee" line on a Quit Claim Deed to the Mine so that Defendant Jack San Felice could complete it and record it with the Pinal County Recorder. Debtor signed the "grantee" line without the remainder of the Quit Claim Deed being completed. Jack San Felice advised Debtor that he – Jack San Felice – would get the grantor signature and record the Quit Claim Deed pursuant to the Joint Venture Agreement. (Campbell Declaration, Exhibit 2)

11. San Felice recorded the Quit Claim Deed on 08-22-06, but the transfer was of only ½ of the Mine. Exhibit 7. Later, on April 18, 2007, SKM attempted to re-deed the same ½ interest back to SKM. Exhibit 8. The signature on Exhibit 8 purporting to be that of Debtor was a crude forgery. All this was unknown to Debtor, Strojnik or Hüning. Debtor, Strojnik and Hüning were likewise unaware that the owner of the Silver King Mine and mining claims had passed away, and that the Silver King Mining Company was not the true owner of the mining rights to the Mine. In fact, the mining rights were never transferred to the Joint Venture. (Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

12. APM was unaware that Silver King Mining Company was perpetrating a mining fraud upon them. (Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

13. Accept breached the Loan Agreement. Id.

14. As a result of Accept's breach of the Loan Agreement, APM was unable to fund the Joint Venture and, thus, as of September 8, 2006, APM was in breach of the Joint Venture

Agreement. (Id.; Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

15. On or about October 23, 2006, Debtor advised Strojnik that he could no longer afford to pay his legal fees. Debtor offered the only asset he had available for trade – the APM Stock – in exchange for $10,000 in fees. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2)

16. At the time of the offer of APM stock for fees, APM was a shell corporation; the entirety of APM's balance sheet (if one existed) would show that APM had no assets and the APM equities were without value:

   a. On the asset side, a claim for breach of the loan agreement with Accept; and
   b. On the liability side, a breach of contract liability to Silver King Mining Company. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

17. The United States District Court for the District of Arizona found in the *APM v. Accept* litigation that the actual value of the claim for breach of contract against Accept was $1.00. See Judgment, Doc 41, Exhibit 9. The costs in attorney's fees liability to APM for achieving the $1.00 judgment was $49,122.50 in fees and $420.00 in costs. (See *APM v. Accept* at Doc 43)

18. Thus, at the time of the exchange of fees for stock, the stock had negative value, and TCMS received no value. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

19. On the very same day when Debtor transferred the APM Stock to TCMS Investments, Inc., that is, October 23, 2006, Debtor resigned as an officer and as a director of APM. (Exhibit 10)

20. Following the complete separation of Debtor from APM both as a shareholder and as an officer/director, Hüning continued to seek funding for the Joint Venture, without success. (Strojnik Declaration, Exhibit 1; Hüning Declaration, Exhibit 3)

21. On November 17, 2006, the Forest Service issued a formal cease and desist order to the Silver King Mine. Under the terms of the Order, Silver King Mine had to stop operations unless it filed a reclamation bond. Exhibit 11.

22. Silver King contacted the Debtor to inquire whether Debtor could find the funds to pay for the bond in exchange for an interest in the Silver King Mine. On November 21, 2006, Silver King issued a letter to the Forest Service authorizing Debtor as a "designated agent" of the Silver King Mine for the purpose of the reclamation bond. Exhibit 12.

23. At this time:

   a. Debtor had no interest in APM;

   b. Debtor was an agent for the Silver King Mine;

   c. The Joint Venture had no assets and was worthless; and

   d. APM had no assets and was worthless. Id.

24. Debtor then approached TCMS Investments, Inc. and Dr. Hüning to see whether they could contribute to the bond in the approximate amount of $140,000.00. Debtor indicated that he could come up with $100,000.00 if TCMS and Hüning each came up with $20,000.00.

25. Indeed, TCMS agreed to invest $20,000.00; Dr. Hüning agreed to invest another $20,000.00, and Debtor agreed to invest the remaining $98,796.00. TCMS, Hüning and Debtor entered into a loosely structured organization under the name The Funding Group, and memorialized their relationship in writing. Exhibit 13.

26. Strojnik had no equitable, legal, community, joint or other interest in the Funding Group. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3.)

27. Debtor paid the bond to the US Forest Service. Exhibit 14.

28. On the same day, the APM-SKM Joint Venture Agreement was modified to reduce APM's interest from 60% to 30%, and accepted The Funding Group as a new 30% partner. Exhibit 15.

29. At the time of the acceptance of The Funding Group into the Joint Venture, Strojnik still represented Debtor in the ACC and AGRA litigation matters. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2)

30. On December 7, 2010, Strojnik and Mike Dailey, ACC Attorney, discussed a possible resolution of the ACC Litigation. During the discussion, Dailey stated to Strojnik that as part of a settlement, Debtor would have to dismiss with prejudice the AGRA Litigation. (Strojnik Declaration, Exhibit 1)

31. If Debtor's case against AGRA were dismissed with prejudice, then Strojnik's contingency fee interest would be terminated and Debtor would become indebted to Strojnik based on Strojnik's regular hourly fee. Debtor and Strojnik both knew that Debtor could not pay hourly fees for work previously preformed by Strojnik under a contingency fee

arrangement. Therefore, Strojnik agreed to provide the services in connection with the AGRA Litigation pro bono. On December 12, 2006, Strojnik and Debtor entered into a Modification of Fee Agreement which stated, in part:

1. The parties agree and understand that the Contingency Fee Agreement dated 06-22-06 is no longer viable since, in part, ACC has made a demand on Client to dismiss the case against AGRA Technologies and the Notice of Involuntary Trusteeship as a part of the settlement between Client and the ACC. Therefore, Client, in the absence of this Modification of Fee Agreement, would become indebted to Attorney at the full hourly rate for the AGRA litigation from the commencement of representation to the conclusion of the representation. Attorney agrees to provide the entirety of fees relative to the pending litigation case against AGRA Technologies, Inc. free of charge.

2. Contemporaneously herewith, Client will execute a document entitled "Assignment Of Funding Group Interest and Rights Arising Out of the Funding Group Agreement dated 11-27-06" by which Client shall assign all of its right, title and interest to Client's holding in the Funding Group to TCMS Investments, Inc. Client understands that Client is giving up Client's entire interest in the Funding Group and the rights arising out of the Funding Group Agreement dated 11-27-06.

3. Attorney shall provide the entirety of fees relative to the ACC action and the AGRA Technologies action for Client free of additional charge.

4. The provisions of the previous agreements between the parties not inconsistent with this Modification shall remain in effect.

(Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Exhibit 15)

32. At the time of the Modification, the Funding Group had only one asset: Its 30% interest in the Joint Venture Agreement. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

33. At the time of the Modification, the Joint Venture had no value for the following reasons:

  a. The Silver King Mine had never been transferred to the Joint Venture by Silver King Mining Company; and

  b. The Silver King Mining Company was not the record owner of the Mine;

c. Even if the Joint Venture owned the Mine, there was no money to put it into operations. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

34. Since the Joint Venture had no value, The Funding Group's 30% interest in the Joint Venture had no value. Id.

35. Since the Funding Group's interest in the Joint Venture had no value, Debtor's interest in the Funding Group had no value. Id.

36. By transferring his interest in The Funding Group to TCMS Investments, Inc., TCMS received no value. Id.

37. By agreeing to provide additional services free of charge, Strojnik incurred an obligation without a return consideration. Id.

38. The value of Debtors interest in The Funding Group as of December 12, 2006, was $0.00. Id.

39. As of November 27, 2006, Debtor owed Strojnik $185.00 in attorney's fees for the ACC Litigation hourly fee matter and $0.00 for the AGRA Litigation contingency fee matter. (Strojnik Declaration, Exhibit 1; Exhibit 16 comprised of Strojnik invoices to Debtor)

40. As of December 12, 2006, Debtor owed Strojnik the sum of $7,280.00 for the ACC hourly litigation matter and $0.00 for the AGRA Litigation Contingency Fee Matter. (Strojnik Declaration, Exhibit 1; Exhibit 16)

41. As of December 12, 2006, Debtors were not insolvent. Debtor's assets – as of December 12, 2006 – exceeded Debtor's liabilities. Debtors agreed to enter the consent order in the ACC action not because it was just or because the money was due or because they had done anything improper; they executed the consent order because they were tired of fighting. (Campbell Declaration, Exhibit 2)

42. After December 12, 2006, Pursuant to the Modification Agreement, Strojnik provided the following legal services to Debtor:

| Period | Time (Hrs) | Amount |
| --- | --- | --- |
| December 13 – December 21 2006 | 37.6 | 13,160.00 |
| January, 2007 | 18.15 | 6,475.00 |
| February, 2007 | 7.20 | 2,520.00 |
| March, 2007 | 6.90 | 2,415.00 |
| April, 2007 | 0.00 | 0.00 |
| May, 2007 | 6.00 | 2,100.00 |
| June – July, 2007 | 13.15 | 4,602.50 |
| August, 2007 | 4.60 | 1,610.00 |
| **TOTAL** | **93.60** | **32,882.50** |

(Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Exhibit 16)

43. The 12-12-2006 transfer of Debtor's Funding Group Interest – was a contemporaneous exchange for credit for new fees. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2)

44. Both transfers – the October 23, 2006 and the December 12, 2006, transfers were both of the following: They were made in the ordinary course of business or financial affairs of the debtor and the transferee; and (2) the payment was made according to ordinary business terms. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2)

45. As of December 12, 2006, Strojnik did not know that the Silver King Mine had perpetrated a massive fraud on APM, the Funding Group and TCMS, although Strojnik was certain that the Joint Venture was probably worthless. Nonetheless, Strojnik agreed with Mr. Campbell to assign a generous value of $1,250.00 to the Funding Group interest. Strojnik made the following notation on the invoice dated 12-28-2006:

| CASE | DATE | DESCRIPTION | AMOUNT |
|---|---|---|---|
| Securities | 12-12-06 | Flat Fee Agreement: Stock for fees. Stock value at the time of the agreement: $1,250.00. No more billing. | $0.00 |

Strojnik's valuation of the Funding Group was wrong; Funding Group was worthless. (Strojnik Declaration, Exhibit 1; Campbell Declaration, Exhibit 2; Hüning Declaration, Exhibit 3)

RESPECTFULLY submitted this 24th day of February, 2010.

_____
Peter Strojnik
Attorney for Defendants